**SENTENCING MEMORANDUM ON BEHALF OF RAFAEL ASTACIO**

Docket Nos.: 13 CR 640-002
                13 CR 640(S-1)-002

Honorable Joseph F. Bianco

## <u>LIST OF EXHIBITS</u>

Letters to the Court from Rafael Astacio …………………………..………………….……… Exhibit A

Letter to the Court from Nancy Astacio ……………………………………………………… Exhibit B

Letter to the Court from Denise Ramos …….……………...…………………………….……… Exhibit C

Letter to the Court from Captain Nicholas Astacio …………………………..……………… Exhibit D

Letter to the Court from Alexander Burgos ……….…………………………………………… Exhibit E

Letter to the Court from John Torres ………………….……………………………………… Exhibit F

Letter to the Court from Roberta Nelson ………………………………………………..…… Exhibit G

Letter to the Court from Carlos Cruz ………………………………………………..…... Exhibit H

Letter to the Court from Brenda Rivera ………………………….……………...…….. Exhibit I

Letter to the Court from Alexander Burgos, Jr. …………………………………………….. Exhibit J

Letter to the Court from Carmen Garcia ……………...………………………………… Exhibit K

Letter to the Court from Steve Alonso …………...……………………….……………..…. Exhibit L

I.      **INTRODUCTION**

This memorandum and attached exhibits are respectfully submitted for the Court's consideration prior to imposing sentence on Rafael Astacio.  Mr. Astacio is before this Honorable Court to be sentenced upon his conviction of one (1) count of Conspiracy to Commit Interstate Transportation of Stolen Property, in violation of 18 U.S.C. § 371, and one (1) count of Fraud and False Statements in filing an income tax return, in violation of 26 U.S.C. § 7206. Through this pre-sentence submission, we respectfully request that this Court exercise the greatest possible degree of mercy and leniency in sentencing Mr. Astacio.  We have structured a sentencing option for Your Honor's consideration which we believe is in keeping with the needs of justice and seeks to address the individualized factors in the instant case.  We respectfully request this Court to exercise its discretion to sentence Mr. Astacio to a sentence that is "sufficient, but not greater than necessary," to achieve the goals of sentencing.  We hope that this information and accompanying letters serve to articulate the history and character of the man who will stand before you for sentencing on November 6, 2015.

II.     **PRESENTENCE REPORT AND ADVISORY GUIDELINE CALCULATION**

The Pre-Sentence Report ("PSR") accurately states that on June 26, 2014, Rafael Astacio pled guilty to Count One of the Indictment, Conspiracy to Commit Interstate Transportation of Stolen Property, in violation of 18 U.S.C. § 371, and Count One of a single-count Superseding Information, Fraud and False Statements related to filing an income tax return, in violation of 26 U.S.C. § 7206.  PSR ¶ 1.  Count One of the Indictment charged Mr. Astacio with conspiring to commit the interstate transportation of stolen property, namely sunglasses, between April 2010 and June 2012, in violation of 18 U.S.C. §§ 371 and 2314. PSR ¶ 2.  Count One of the

Superseding Information charged Mr. Astacio with filing a false income tax return on March 6, 2011, in violation of 26 U.S.C. § 7206.  PSR ¶ 3.

The PSR accurately calculates Mr. Astacio's Criminal History Category ("CHC") to be Level I.  PSR ¶ 53.  However, we suggest that the total Guideline offense level of 27 is inaccurate for three reasons. First, the Probation Department relies on U.S.S.G. § 1B1.3 in determining relevant conduct that should be counted in Mr. Astacio's Guidelines calculation. In calculating Mr. Astacio's Guideline range, Probation determined that all of the residential and commercial burglaries—which are state crimes—can be subsumed under the count charging conspiracy to transport goods across state lines as relevant conduct. However, the commentary to § 1B1.3 does not address state crimes with no federal counterpart being considered as relevant conduct to increase the Guidelines Range of a purely federal crime. As Probation states on page 15, ¶ 30, relevant conduct adjustments are due to "any intended offense conduct that can be established with reasonable certainty." Putting aside any proof issues that might arise at a trial with regard to the "reasonable certainty" requirement, the immediate question is whether any of the burglaries can be defined as relevant conduct at all. Even if the burglaries involved all of the same perpetrators as the Interstate Transportation of Stolen Property charge, they are acts which occurred squarely within the confines of state law. There is no evidence that the participants in any of the burglaries other than the Eye King sunglasses burglary intended to transport the proceeds of the burglaries—whether money or goods—outside of New York, and there is no evidence that they actually did so for any burglary other than Eye King. As such, the assumption by Probation that the other burglaries should count as relevant conduct is just that, an assumption, unjustified other than by reference to the relevant conduct section of the Guidelines

4

which doesn't seem to apply. The assumption that these acts are relevant conduct that should count is an assumption that must be justified before the Court should credit it.

Second, even if we credit Probation with an accurate interpretation of the Guidelines, Probation's calculation assumes participation in aspects of the conspiracy that Mr. Astacio did not admit to in Court, to the Government in his multiple meetings with them, to the Probation Department, or even contemplate as part of the offense conduct for which he accepted responsibility. As detailed below, though the Government may have provided the Probation Department with information derived from a source or sources as to Mr. Astacio's involvement in the conspiracy, Mr. Astacio is very clear about which specific events in the conspiracy he was involved in, and which he was not. (He does not dispute involvement in the conspiracy itself.) Mr. Astacio primarily served as a driver and lookout. He rarely, if ever, entered the burglary locations. Specifically, Mr. Astacio objects to the following:

• 5 Elizabeth Drive, Laurel Hollow, New York.  PSR ¶ 12, 13. Mr. Astacio denies the allegation that he was present for this attempted burglary.

• 3273 Wolfson Drive, Baldwin, New York.  PSR ¶ 16.  Mr. Astacio denies the allegation that he participated in the burglary, but admits to running a computer database search on the location.

• 152 Yukon Drive, Woodbury, New York.  PSR ¶ 17.  Mr. Astacio denies the allegations that he participated in the burglary.  Mr. Astacio was in Puerto Rico with his family on the date of the offense.

Third, as to the Guidelines calculation, the loss amount would directly relate to the acts the Court determines to be relevant conduct and, as such, both the Guidelines level and the

amount of any restitution order could change dramatically if the burglaries were not considered relevant conduct.

The Guidelines calculation also includes a two-level enhancement for Mr. Astacio's role in the offense.  PSR ¶ 33.  Probation contends that Mr. Astacio abused a position of public trust in the commission of the instant offense by identifying himself as an NYPD Detective to uniformed NYPD officers inquiring as to the reason why Mr. Astacio was parked near a location where a co-conspirator was arrested. PSR ¶ 25. This enhancement, however, is not warranted. The NYPD Patrol Guide establishes a clear hierarchy between uniformed and non-uniformed NYPD members.  The rule governing confrontation situation explicitly states:

> The type and circumstances of encounters between members of the service – whether in uniform or civilian clothes, both on and off duty – are so varied they defy all-encompassing guidelines…It must be absolutely clear in the minds of all members of the service that in any confrontation, the *burden of proving identity rests on the CONFRONTED OFFICER whether on or off duty*.

P.G. 212-33: <u>Confrontation Situations</u> (emphasis added).  Here, Mr. Astacio was confronted by a uniformed officer.  As Mr. Astacio was the confronted off-duty officer, he identified himself as a detective as required by the NYPD Patrol Guide.  Mr. Astacio did not request special treatment from the officer, and did not produce his police identification to obtain special treatment; he produced his identification because he was required to do so by the rules and regulations of his department.

Given the above considerations, and the additional information raised below, Mr. Astacio respectfully requests that this Court exercise its discretion to adjust the Guidelines Calculation as suggested above.

## III.   PERSONAL HISTORY OF RAFAEL ASTACIO

*Early Years & Personal Life*

Rafael Astacio was born on October 17, 1972, in Brooklyn, New York, to Rafael and Nancy Astacio.  His parents separated when Mr. Astacio was approximately three years old. Mr. Astacio remained with his mother, but visited his father twice per month.  After his parents divorced, his mother, Nancy Astacio struggled financially and relied on Mr. Astacio for financial support.  Nancy Astacio is a retired special education teacher and was on the New York City Board of Education.  She suffers from high blood pressure, asthma, and Sarcoidosis, a condition causing inflammatory cells to cluster in her lungs.  Nancy Astacio wrote this Court describing Mr. Astacio's childhood.  She writes:

> [Rafael] has overcome many obstacles in his life to accomplish his goals, but the main thing he overcame was the lack of a father figure.
>
> As a single mother, there were many tough times for me, trying to make ends meet. [Rafael] would always tell me not to worry as he would always be there for me. And he was always there for me, and for his sister, Denise.  He would make sure she had clothes, sneakers, lunch money when I didn't have, and anything else she may have needed.  She may not have had everything she wanted, but she had everything she needed, especially the love and caring of her big brother.  [Ex. B].

Mr. Astacio has one maternal half-sister, Denise Ramos.  Ms. Ramos resides in Brooklyn with Nancy Astacio and is employed with the New York City Board of Education.  Ms. Ramos wrote this Court describing Mr. Astacio as a "protective brother" and "great role model" in her life.  Exhibit C.  Ms. Ramos goes on to illustrate how her brother filled the paternal void in her early life.  She writes:

> Since I was a young girl, [Mr. Astacio's] guidance has been irreplaceable, as my father and I are estranged.  He always helped our mother as well as me by working part time in a catering hall while attending high school, to make sure that we had everything we needed, as well as wanted…He provided guidance and assistance to me with my homework as well as everyday living. My brother acted as if he were

the main of the house, taking on all responsibilities of a father.  He has guided me, reprimanded me and encouraged me to be the best that I can.  [*Id.*].

Mr. Astacio's father, now 62, remarried in 1980 and currently resides in Queens.  Mr. Astacio has three paternal half-siblings.  Mr. Astacio's half-sister, Arlene Astacio, resides in Brooklyn, New York with her husband and child.  Michael Astacio, age 26, is a corrections officer.  Captain Nicholas Astacio has been a pilot in the U.S. Marine Corps for 18 years and is currently stationed in Okinawa, Japan.  In his letter to the Court, Captain Astacio credits his brother for "plant[ing] the seed of public service and influenc[ing] [Captain Astacio] to contribute in making the world a better place."  Exhibit D.  Captain Astacio goes on to describe Mr. Astacio's long-standing commitment to public service.  He writes:

> As long as I can remember, I looked up to my brother…I marveled at his passion to serve the community.  He was well-known throughout the neighborhood as a positive role model.  Particularly, he mentored under-privileged, urban young men in various baseball leagues.  Furthermore, he visited Brooklyn elementary schools in an effort to promote the "Drug-free America" campaign.  My brother embodied the pure virtues of service and dedication. [*Id.*]

His uncle, Alexander Burgos, Sr., a former Department of Environmental Protection Borough Manager, describes Mr. Astacio's childhood in his letter to the Court.  He writes:

> Like myself, Ray was raised in a single parent household and, proudly, I became his significant other.  He was reared in a humble yet family oriented home where respect, family values, moral and the belief in the protestant work ethic were the order of the day.  [Ex. E].

Mr. Burgos continues:

> As a boy scout, once Ray learned how to fish, he would go out on weekends and sell his catch for that day at the local train station on McDonald Ave, in Brooklyn.  Of the proceeds, he always gave his mother (my sister) half.  In later years, in order to help around the house, Ray worked as a server in a catering hall and coached children at a homeless shelter in Staten Island.  [*Id.*].

Rafael Astacio married Elizabeth Alvear, now age 43, on November 1, 2001 in Queens, New York.  They have a twelve year-old son, Timothy.  Mr. Astacio also has a step-daughter,

Tiffany Rivera, from Mrs. Astacio's previous relationship.  Mr.  Astacio has been involved in

Ms. Rivera's life since she was four years-old.  Ms. Rivera, now age 21, is currently a full time

college student.  Mr. Astacio has a very good relationship with both of his children. His wife,

Elizabeth, was shocked when her husband was arrested for the instant offense and cannot begin

to fathom how or why he became involved in such conduct.  PSR ¶ 64.  Mrs. Astacio stresses

that although she understands that the instant offense may paint a certain picture of her husband,

this conduct is "not who he is," rather, he is a "good man who made a horrible mistake" and is

truly sorry and heartfelt with remorse.  *Id.*

Rafael Astacio's family and friends regard him as a hard-working and dedicated family

man, an excellent father, loving husband, caring son, and loyal friend.  Many of his friends and

family wrote this Court describing his family-oriented nature and willingness to help those in

need.  His longtime friend, John Torres, wrote this Court describing Mr. Astacio as a

compassionate, kindhearted individual who "always says yes to anyone in need."  Exhibit F.  Mr.

Torres continues:

> I have had the pleasure of knowing Ray for over fifteen years.  I have always been
> impressed with his character.  He is a responsible and dedicated family man.  I have
> personally observed his interactions with his family as loving and caring.  He is an
> excellent father and husband.  He has [a] genuine sincere approach to everyone that
> comes in contact with him.  He has earned the respect of his colleagues, friends,
> and family through his positive demeanor and personality.   His concern and
> compassion for others are qualities that may Ray an extraordinary individual.  He
> has always, as far as I could remember, been part of his community. [*Id.*].

Roberta Nelson has known Mr. Astacio for over eighteen years.  She wrote this Court

describing Mr. Astacio as "a good friend who will always be there for you if needed."  Exhibit

G.  Ms. Nelson continues:

> [Mr. Astacio] is very good to his mother Nancy, and a great brother to his sister
> Denise.  He walked her down the aisle at her wedding, stepping in for her absentee
> father.  He is always loving and available to his son, Timothy, and an excellent

father to his step-daughter Tiffany.  They are a very close knit family and I consider him a good friend.  [*Id.*].

Carlos Cruz has known Mr. Astacio for over ten years.  Mr. Cruz wrote this Court describing Mr. Astacio as a "kind, giving, and loving person," who has always been "reliable and supportive."  Exhibit H.  Mr. Cruz continues:

> I first met Ray in the summer of 2003, when we played for the same baseball team. We quickly became friends and over the years I have become very close to Ray and his family.  He has always been well-liked and appreciated by his peers and coaching staff.  He is an honorable man, devoted husband and doting father.  Ray is a responsible person and is well respected in his community.  [*Id.*].

Mr. Astacio's cousin, Brenda Rivera, has been close with Mr. Astacio since childhood.  In her letter to the Court, Ms. Rivera recalls their formative years together:

> We grew up together and have we have remained close since childhood.  I briefly lived with Mr. Astacio and his family for a time during our young lives so we are extremely close.  During that time Mr. Astacio was a pre-teen who was very involved in his school projects and sports…He was a well-rounded and vibrant young man that was very much liked by his peers.  [Ex. I].

His younger sister, Denise Ramos, writes:

> My brother's smile lights up a room…It is his charisma, his big bear hugs and his playful way of picking on me that will always remain in my heart and mind.  He is the typical over-protective brother, scaring every boy that I ever attempted to bring around my family.  But what he will never know is that I always look for someone with the same qualities as him.  There is no one better than my big lug of a brother…When he is around, my family never stops laughing and we always feel so loved because he makes sure to go above and beyond for us.
>
> He is a very caring and protective brother as well as a great husband and father.  He shows care and concern in the most subtle manner and gestures, but he is the one person that sees me through.  I pray that all sisters have a perfect brother life him.  Our brother-sister relationship is one of my most cherished previous and prized gifts that the Lord has granted in my life.  I am truly blessed.  [Ex. C].

Mr. Astacio's cousin, Alexander Burgos, Jr., writes:

> Throughout my whole life Rafael has always been there for me through good times and bad times.  He has been the one constant that I could depend on to lift my spirits or just make things better…Most importantly, he showed me what it was to be a

10

good family man, provider and father figure as it was something we both grew up without but always wanted to have. He kept me motivated to better myself and showed me the type of family man I wanted to become. When I needed to talk he is always there and understands and helps me through. [Ex. J].

Mr. Burgos, Jr. continues:

He is a wonderful father to his 12 year old son and a great god father to my oldest son, always making sure to attend baptisms, sporting events and family gatherings. For him family comes first and making sure that everyone is taken care of and is his first priority. This case has taken a large toll on our family but has made us come together stronger. [*Id*.].

Carmen Garcia writes:

I have known the family of Rafael Astacio for 20 years. I am writing to you for a little compassion at the sentencing of this wonderful young man and his family. This young man has always been a wonderful son and family man, especially to his young son and mother. He has always respected the elderly people he works for and with, including my husband and me. [Ex. K].

Brenda Rivera, Mr. Astacio's cousin, echoes Mr. Burgos' sentiments in her letter to the Court. Ms. Rivera writes:

[Mr. Astacio] loves to have his family together that is why it is no wonder that he is the best father I have ever known. He cares immensely for his family and they mean the world to him…Everything he does, he does with the intention of making it a great experience for his family. Anybody who knows him knows him as a dedicated working family man. [Ex. I].

Rafael Astacio maintains a close relationship with his family members and friends. Mr. Astacio's loved ones are aware of his arrest for the instant offense and have remained supportive.

***Education and Employment***

Rafael Astacio dreamed of becoming a member of the New York City Police Department ("NYPD") since he was a young boy. Unfortunately, it was the tragic murder of his grandmother on October 17, 1971 - exactly one year before his birth - that fueled his desire to serve and protect. <u>See</u>

<u>Exhibit A</u>.   In his letter to the Court, Mr. Astacio describes his professional aspirations and

accomplishments.   He writes:

> To[] help and protect all walks of life was something I was born to be.  [The] reason
> why I felt this was because my Grandmother was murdered by her second husband
> on October 17, 1971.  He shot her two times in the upper chest area killing her
> instantly…[H]er husband…pled guilty and received 2 years of jail time for the
> murder of my grandmother whom I never was able to meet do [sic] to this situation
> that transpired…One year later on October 17, 1972, I was born just a few minutes
> apart from my grandmother's death time.  I feel, your Honor, it was fate, that I
> become a New York City Police Officer.  [*Id.*].

In her letter to the Court, his mother, Nancy Astacio, elaborates on the obstacles Mr. Astacio

faced in realizing his dream of becoming a member of the NYPD.  She writes:

> In elementary school, [Rafael] had difficulty focusing, and in Fourth Grade his
> teacher noticed that he had a problem with reading and writing.  After being tested
> extensively, he was diagnosed with dyslexia.  He was placed in a Special Education
> class, where he constantly complained he did not belong…His teacher…kept
> telling me to find other placement for him, as he did not belong there.  I fought the
> Department of Education, and finally received the services he needed for his
> dyslexia.  In high school, he was placed in a general education classroom, with
> resource room, extra time for testing, and 1:1 reading tutoring.  I also took him to
> therapy twice a week…with this help, he was able to graduate on time with his
> class.  [Ex. B].

His mother continues:

> During his high school years, he worked as a waiter in a catering hall, as well as
> working in a homeless shelter providing for the needs of less fortunate families.  He
> would take the younger children on trips to experience things they never had, such
> as meeting Santa Claus, NFL football players, and Broadway actors.  These
> children were given clothing and sneakers that they would not have been given if
> not for my son's efforts.
>
> There were many nights that he would work past midnight, and he would call me
> to pick him up.  Not matter how late he worked, he always got up in the morning
> to go to school. [*Id.*].

At the age of seventeen, Rafael Astacio sat for and passed the NYPD entry exams.  He entered

the Police Academy shortly after and graduated at the age of twenty.  Nancy Astacio recalls this moment

in her letter to the Court, writing:

While he was attending John Jay College, he was called to enter the Police Academy.  He was so excited that, through all his adversity, he made it!! He would get home from the Academy late, but being the responsible student he was, he made it to John Jay every morning.  [*Id.*]

Looking back, Mr. Astacio reflects that he was "very proud of myself.  I felt I was able to forfill

[sic] my commitment to myself and my grandmother to help and protect."  <u>Exhibit A.</u>  Mr. Astacio goes

on to discuss his tenure at the NYPD, writing:

I thrived in the NYPD.  I have worked in the worst crime areas New York has to offer.  I was a NYPD undercover for 5 years, purchasing numerous amounts of drugs for the department.  In 2000, I was promoted to the rank of Detective, [a]t which time I was transferred to the Vice Squad.  During my two years [in the Vice Squad], I worked on numerous human trafficking cases with the FBI.  [*Id.*].

He continues:

The case I am most proud of was when I worked for the Manhattan Special Victims Squad.  The case at hand was nationally televised and labeled "The Harlem Rapist." A young male… [responsible for raping] 13 women in a month and a half time span causing rage for the Harlem community.  At this time, with numerous members of the NYPD, I apprehended said male, causing a huge relief for the women in Harlem. [*Id.*].

His uncle, Alexander Burgos, Sr., wrote this Court praising Mr. Astacio's work ethic.  He writes:

At age 20, upon graduating from the academy, Ray worked with unparalleled commitment and determination as a police officer and was eventually assigned to details such as Narcotics, Vice, Sex Crimes et al until he was finally promoted to SVU.  Many a night, he would sleep on a bunk at the stationhouse for 2-3 days at a time while working a case.  And when he didn't sleep because of the demands of the job, he was purchasing drugs, undercover, in a hallway at 3 a.m. in New York's Washington Heights section.  [Ex. E].

Steve Alonso, a retired NYPD detective, wrote this Court describing Mr. Astacio as "a man of

great integrity" who is "extremely dedicated to his family and work."  <u>Exhibit L</u>.  Mr. Alonso continues:

I have known Ray Astacio for 20 years as one of my closest friends and best man in my wedding and also as my partner in the New York City Police Department of two years…I know from my personal experience that people do go thru [sic] a period in their life where they do things out of the ordinary and commit errors in life in which an individual like Ray has done.  It can discredit a person of his stature. Rest assure [sic] Ray has always helped people in their time of need and never

13

turned a blind eye to help someone who needed help. He was a great Detective and great human being and of course a great father to his kids. [*Id*.].

Alexander Burgos Jr., Mr. Astacio's cousin, writes:

> [Rafael's] been my role model and person I looked to imitate the most as his actions always seemed to produce great results. He has shown me to work hard for what you want, as he graduated from the academy at an early age and climbed the ranks to become a respected Detective that served his community and took many salacious people off the streets, whether it was drug dealers, crooks, or pedophiles. Most importantly he showed me what it was to be a good family man, provider and father figure as it was something we both grew up without but always wanted to have. [Ex. J]

His friend, John Torres, writes:

> [Ray] joined the New York City Police Department to continue to provide assistance and protect anyone in need. This is just who he is as a person. He is a kindhearted individual. Serving almost 20 years as a uniform[ed] officer and detective shows his dedication to his job, family, and community. He has always been a man of honor and respect.

> I am asking to please take into consideration all the good that he has done for the City of New York, his friends and most importantly his family. Ray understands that [he] has made a terrible mistake that has tarnished his character. I know Ray is deeply sorry and regrets his actions. Please give him the opportunity to make amends and allow him a chance to rebuild his life with his family. [Ex. F.]

After Mr. Astacio was arrested and subsequently fired from the NYPD, he cashed in his remaining retirement savings and purchased a bagel shop in Oceanside, New York so that he could have steady employment until the conclusion of his case, as well as continued income for his family and for restitution, should he be incarcerated. Elizabeth Astacio quit her job as an underwriter in recent months to learn the business and use that income to continue to support their children and her mother, Ida Chaluissant, who lives with the Astacio family, should her husband be incarcerated. PSR ¶¶ 63, 64.

***Present Circumstances***

In his letter to the Court, Rafael Astacio accepts full responsibility for his actions and

candidly addresses the consequences his actions have had on his loved ones.  Mr. Astacio writes:

> As you can see Judge Bianco, I took pr[ide] in the work I was meant to do.  Now I
> am sitting her wondering to myself what happen[ed], what went wrong and why.
> The work I produced [at the NYPD] spoke volumes for myself and for my
> family…I take full responsibility for my actions and I am very remorseful of what
> I took part of.  There [are] no words that can describe the pain and embarrassment
> I have placed upon myself and my family.  I once stood as a proud individual with
> pride and dignity.  I would love to work and strive to be that person once again.
> [Ex. A].

Mr. Astacio's brother, Captain Nicholas Astacio, writes:

> Recently, my brother has deviated from the course of honor and integrity.  He
> succumbed from the pressures and influences of deceit and unfaithfulness.  He
> confided, to me, his temporary lapse in judgment, in turn jeopardized his family,
> friends, career and reputation.  However, he sincerely understands the ramifications
> and is prepared to make this right.  This experience has made him realize the true
> pleasure in life…family.  [Ex. D].

Brenda Rivera, Mr. Astacio's cousin, writes:

> I know from conversations with Mr. Astacio that he is extremely despondent in the
> knowledge of the impact with which a [ ] conviction poses to his future, he is most
> despondent on the impact it will have on his family, especially his children…I was
> extremely dismayed to hear of his transgression.  I have spoken to him regarding
> the events in question and I can truly say that it has been a source of extreme regret
> and embarrassment.  As uncharacteristic as this has been for him, he would like to
> take responsibility for and move on from this.  I know that if given the chance he
> will continue to make positive contributions to society as he has done for the last
> twenty years serving and protecting our communities as a police officer.
> [Ex. I].

Mr. Astacio's uncle, Alexander Burgos, Sr., wrote this Court expressing his concern for

Mr. Astacio and his family:

> [A]s a father, Ray filled that "paternal void" in his [own] life by becoming a
> dedicated, loving, and devoted father to Timothy.  One only has to witness the
> interaction between them at a family gathering to comprehend the magnitude of the
> bond…most should have been so fortunate!  As such, it is hard to fathom the
> inherent ramifications that Ray's separation from Timothy will have on him once

sentenced.   Surely the separation of father and son at such a critical time in Timothy's development may, in all likelihood, have a lasting impact in his life. [Ex. E].

Mr. Burgos continues:

> Undeniably, my nephew has erred in his actions of late: many have made mistakes in their lives at one time or another.  His arrest was of great shock and devastation to us all.  He is both ashamed and remorseful for the hurt and shame he has caused everyone, including himself.  At age 19, I lost my mother after being shot and murdered…by my stepfather for which he served 8 months and six days in jail. Exactly one year later, to the day, we were blessed with Ray's birth.  It has not been easy overcoming that insurmountable obstacle: today, however, we are faced with further devastation in our lives.

> Perhaps incongruent to the matter at hand, your honor, but combined, this family has contributed 208 proud years of government service to our country and continue to do so…I respectfully ask that you consider giving Ray the opportunity to get his life back on track and can only beg for leniency for his mistakes.  [*Id.*].

Finally, Mr. Astacio wrote this Court expressing his deep regret for his "behavior and actions that have devastated my family and stripped me of my title and the respect of all my peers and actions that have caused so much pain and anguish."  Exhibit A.  Mr. Astacio continues:

> These actions that place me here before you embarrassed and ashamed.  That course [of action] that destroyed all that I stood for and worked so hard to achieve.  To be perfectly honest your Honor, I became entangled in a sick and insidious web of sheer madness. Believe me your Honor that person is dead…I understand all that is hat hand.  I have deep remorse and regret for all that has transpired.  I have truly changed for the better, I take nothing for granted.  I weigh my actions very heavily and seek positive solutions and honest ones.  [*Id.*].

Now, Mr. Astacio prepares to accept the consequences of his lapses in judgment and is ready to build on the promise he has demonstrated throughout his life.  Like most things, it will not be easy, and Mr. Astacio will have to work harder than ever before; but with his family and friends by his side, Mr. Astacio will receive the support necessary to move forward with his life.

IV.     **SENTENCING CONSIDERATIONS UNDER 18 U.S.C § 3553(a)**

There is no legal presumption that a sentence within the applicable Sentencing Guidelines range is *per se* reasonable.  Rather, the Supreme Court has instructed that, after determining the applicable Guidelines range, the sentencing court must "consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with the latter." Nelson v. United States, 555 U.S. 350, 351 (2009).

As this Court is aware, "[t]he overarching command of § 3553(a) is the Parsimony Clause, which instructs district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." United States v. Davis, 2008 WL 2329290 at *4 (S.D.N.Y. June 5, 2008) (quoting Kimbrough v. United States, 552 U.S. 85, 89 (2007) (internal quotation marks omitted). For the reasons discussed below, taking into account the factors enumerated in § 3553(a), we respectfully suggest that a balance of the statutory sentencing factors weigh in favor of a sentence below the Guidelines range, which would be sufficient to meet the sentencing goals of punishment and deterrence.

*Acceptance of Responsibility and Attempts at Cooperation*

Prior to his arrest on federal charges, Mr. Astacio was arrested in Suffolk County on a burglary that was not included as part of the conspiracy herein, though it involved the same co-conspirators. He has subsequently pleaded guilty to that burglary and is awaiting sentencing. In that case, Mr. Astacio was represented by another attorney who practices primarily in New York City. It soon became clear that there was a parallel federal investigation, and Mr. Astacio had an opportunity at that point to offer his cooperation to the government. On advice of counsel, he did not do so, and proceeded to fight the Suffolk County charges.

17

After Mr. Astacio retained our firm, and long prior to the filing of any federal charges against him, we immediately reached out to AUSA Caffarone, who was working the investigation even then. Despite numerous attempts to reach him, he did not get back to us.  In subsequent conversations with Mr. Caffarone, he indicated that by the time we were retained it was too late for pre-arrest cooperation.

Of course, we did what we could. After he was arrested, we brought Mr. Astacio in for multiple proffer sessions with the government, federal agents, and county detectives. Mr. Astacio told them everything he knew, admitting to his role in the conspiracy and providing information on all of the burglaries he knew about or was involved in.  Unfortunately, by this time, his co-conspirators were already cooperating and, because of Mr. Astacio's minor role in the overall conspiracy, he had nothing new to offer: the government already knew about everything Mr. Astacio told them. Thus, given the constraints of U.S.S.G. § 5k1.1, Mr. Astacio was not offered a cooperation agreement, but not for lack of effort on his part. Had he received a correct assessment of his prospects and proper advice sooner, this might not have been the case.

### *Nature of the Offense and the History and Characteristics of the Defendant*

Nothing herein suggests that the crime which has brought Mr. Astacio before this Court is not serious, nor do we intend to downplay that seriousness.  We ask only that it be viewed in context.  While the enterprise at the core of the instant offense was large, Mr. Astacio played a minor role for a limited period of time.  The circumstances of the offense and the history and characteristics of Mr. Astacio justifies a below-Guidelines sentence and is congruent with the statutory mandate to "impose a sentence sufficient, but not greater than necessary," while satisfying the goals of sentencing and the enumerated purposes set forth in the statute.

Understandably, the fact that Mr. Astacio was a law enforcement officer with a duty to uphold the law and protect people can cut both ways.  However, an instance of – admittedly – extraordinarily bad judgment cannot undo the good works of twenty years, or a lifetime.  We respectfully ask the Court to consider the Fifth Circuit's finding in United States v. Chandler, 732 F.3d 434 (5th Cir. Oct. 4., 2013):

> Some of the comments made by the district court here, such as those standing that by being a police officer Chandler has placed himself in a different category and should be held to a higher standard, are similar to those in *Stout* and could be interpreted to cross the line into impermissible reliance on Chandler's socioeconomic status as a police officer.
>
> To the extent that the district court's comments regarding Chandler's position are findings that Chandler abused his position of trust or that the offense was more serious because of Chandler's position, the district court likewise erred.  Though we are mindful that our review in this case is only for plain error, our circuit precedent is clear that a defendant's status as a police officer, standing alone, is not a justifiable reason to increase a sentence.

*Id.* (citing United States v. Stout, 32 F.3d 901, 903-04 (5th Cir. 1994)).

### *Probation's Recommended Sentence is "Greater Than Necessary" to Achieve the Goals Sentencing*

Under Section 3553(a)(2), it is appropriate to make adjustments to a sentence in order to promote respect for the law and adequately punish the defendant; to discourage the defendant from committing the same acts again; and to protect the public from further crimes by the defendant or by others.  See generally, 18 U.S.C. § 3553(a)(2)(A)-(C).  In Mr. Astacio's case, a below Guidelines sentence would properly satisfy these enumerated purposes of sentencing.

### *The Need for Deterrence*

To the extent that criminal sanctions do have a general deterrent effect, the certainty and swiftness of punishment have a far greater deterrent effect than the severity of the sanction.  Mr. Astacio was terminated from the profession that he dedicated his life to.  Therefore, there is no

19

reason to believe that a below-Guidelines sentence will be insufficient for the purposes of specific deterrence. Mr. Astacio is unlikely to recidivate.  He writes:

> Judge Bianco, I understand that you must hear cases such as mine on numerous occasions, but I have learned a valuable lesson, that has [cost] me a lot.  Such as my dream job in which I was born to do, my family's respect and most of all my pride and my livelihood.  Such lesson is something that I would never repeat in this lifetime or any other.  [Ex. A].

A below-Guidelines sentence would also be more than sufficient to deter other would-be offenders from similar criminal conduct.  Mr. Astacio has accepted responsibility for his actions and pled guilty in a timely fashion, thus allowing the Government to allocate its resources more efficiently, as indicated by a reduction of 3 levels in his "Total Offense Level."  PSR ¶¶ 47, 48.

## V.      SENTENCING RECOMMENDATION

As noted above, we respectfully request a sentence of 24 months.  This will provide for appropriate punishment while allowing Mr. Astacio to remain close to his support network of family members and friends and become a contributive member of society.

## VI.     CONCLUSION

As detailed extensively above, we believe that in this particular case, our sentencing recommendation would provide an adequately onerous sentence that is harmonious with the needs of justice: a sentence sufficient, but not greater than necessary.

Respectfully submitted,


BRILL LEGAL GROUP, P.C.


By:     Peter E. Brill (PB0818)
        150 Motor Parkway, Suite 401
        Hauppauge, NY 11788
        (631) 204-8254

20