

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| CCC | *610 Federal Plaza* |
| F. #2011R00917 | *Central Islip, New York 11722* |

December 7, 2015

<u>By Hand and ECF</u>

The Honorable Joseph F. Bianco
United States District Judge
United States District Court
Eastern District of New York
1040 Federal Plaza
Central Islip, New York 11722

Re:   United States v. Rafael Astacio
      <u>Criminal Docket No. 13-640 (JFB)</u>

Dear Judge Bianco:

The government writes in connection with the sentencing of the defendant Rafael Astacio, which is scheduled for December 9, 2015.  On June 26, 2014, the defendant pleaded guilty to conspiracy to commit interstate transportation of stolen property, in violation of 18 U.S.C. § 371, and he waived indictment and pleaded guilty to filing a false income tax return, in violation of 26 U.S.C. § 7206.  Specifically, the defendant, a former detective with New York City Police Department ("NYPD"), was a member of a sophisticated burglary crew.  As a member of that crew, the defendant participated in more than six commercial burglaries and five residential burglaries stealing more than $5.3 million in cash and products.  In fact, the defendant used his position as a detective with the NYPD to locate several of the homes of the burglary targets.  The defendant also failed to report his ill-gotten gains from those burglaries on his federal income tax return.  On October 27, 2015, the defendant filed an amended sentencing memorandum ("Def. Mem.")  requesting a below-Guidelines sentence of 24 months' imprisonment.  For the reasons set forth below, the government respectfully asks the Court to impose a Guidelines sentence of 87 months' imprisonment.

I.     <u>Background</u>

The instant investigation began in 2011 by the Nassau County Police Department ("NCPD").  (Presentence Investigation Report ("PSR") ¶ 6.)  The NCPD was

investigating a sophisticated burglary crew that burglarized both commercial establishments and residences starting in 2009. (Id.) The crew was led by Nikitas Margiellos and included the defendant. (Id. ¶ 7.) Despite expending significant time and resources, including wiretaps, the crew avoided prosecution for years. This is not surprising because the defendant's crew was smart, organized and careful. For example, before they committed a burglary, they conducted surveillance of their burglary victims to determine when the victims would be out of their homes and businesses. (PSR ¶ 8.) In one instance, they even installed a tracking device on a victim's car to assist in that endeavor. (Id. ¶ 16.) Once they adequately investigated the burglary target and developed a plan of attack, they would commit the burglary. (Id. ¶ 8.) They cut telephone lines, disabled alarms and then waited outside to ensure that law enforcement did not respond to that location. (Id.) In an abundance of caution, they also used cell phone jammers to prevent a victim or bystander from calling the police. (Id.) They also positioned someone outside the burglary location to look for law enforcement and to monitor a police scanner. (Id.) In total, the crew committed more than three dozen commercial burglaries, including the offense of conviction, and six residential burglaries stealing millions of dollars of cash and valuables. (Id. ¶ 20.)

The defendant participated in six of those commercial burglaries, including the offense of conviction, and five residential burglaries. (PSR ¶¶ 9, 11, 16-19.) The offense of conviction occurred on April 29, 2010. (Id. ¶ 11.) On that date, the defendant and his coconspirators burglarized Eye King, a business located in Plainview that sold Hobie and Under Armour sunglasses. (Id.) The defendant's coconspirators entered the business, disabled the alarm, cut the telephone line and then exited the business to make sure that law enforcement did not respond to the location. (Id.) They then reentered the business and proceeded to steal more than 5,000 pairs of high-end sunglasses. (Id.) Once the burglary was complete, they transported the sunglasses across state lines in an attempt to sell them. (Id.) They were unable to agree upon a satisfactory sales price. (Id.) Therefore, each of the participants was given his share of the stolen sunglasses. (Id.)

In addition to that commercial burglary, the defendant also participated in five other commercial burglaries: on January 31, 2010, the defendant burglarized Rollin Dairy in Farmingdale; on April 20, 2010, the defendant burglarized Sal's Fruit Tree in Copiague; on July 11, 2010, the defendant burglarized Center Candy in Freeport stealing $30,000 in cash and $600,000 worth of cigarettes; on October 14, 2010, the defendant burglarized Dr. Steven Greenberg's office stealing $1.9 million; and on December 5, 2010, the defendant burglarized Coach in Woodbury stealing $36,000 worth of handbags and accessories. (PSR ¶ 9.) The defendant did not report the monies that he stole during these burglaries on his federal income tax returns. (Id. ¶ 26.)

Additionally, the defendant participated in five residential burglaries. (PSR ¶¶ 16-19, 55.) Specifically, in August 2010, the defendant and his crew wanted to burglarize the home of a business owner but did not know the target's home address. (Id.) The

2

defendant ran investigative searches to determine the address. (Id.) The defendant's crew then installed a tracking device on the target's car to determine when the victim was out of the house. (Id.) After analyzing that data, the defendant and several other members of the crew entered the victim's home stealing approximately $400,000 of property. (Id.)

Several months later on December 31, 2010, the burglary crew decided to burglarize the home of Dr. Steven Greenberg. (PSR ¶ 17.) As set forth above, the defendant and the other members had previously burglarized Dr. Greenberg's office stealing more than $1.9 million. Again, the defendant ran investigative searches to locate Dr. Greenberg's home address. (Id.) The defendant's coconspirators stole $250,000 worth of property. (Id.) The defendant was not present for this burglary.

Also in late 2010, the defendant and his crew targeted the home of the owner of Momma's Pizza in Copiague. (PSR ¶ 19.) The crew followed the owner, his wife and their son from the pizza place to determine where they lived and to learn their schedules. (Id.) On a night when the victims were not home, the defendant and other members of the crew burglarized the home stealing $460,000. (Id.) During the burglary, one of the defendant's coconspirators cut himself. (Id.) One of the crew members went to a nearby store to buy bleach, which was dumped on the blood left at the scene in an effort to destroy the DNA evidence. (Id.)

In February 2012, the defendant participated in another residential burglary. (PSR ¶ 18.) The defendant's crew believed that a business owner who lived in Howard Beach was in possession of a large amount of cash so they decided to burglarize his home. (Id.) Before committing the burglary, they conducted surveillance of the home and developed a plan. (Id.) In furtherance of that plan, they stole a truck. (Id.) On the day of the burglary, one of the defendant's coconspirators dressed as a cable repair person. (Id.) He then cut the telephone lines to the home. (Id.) While he was doing that, the defendant sat in a car down the street and provided lookout coverage. (Id.) He was approached by a NYPD officer who asked why he was in the area. (Id.) The defendant showed the officer his badge and falsely stated that he was waiting for his niece. (Id.) The defendant's coconspirator was caught before he could enter the home. (Id.) The defendant was not arrested for this crime.

At the time of his plea, the defendant admitted that he participated in all ten of these burglaries.

On June 3, 2012, the defendant committed yet another residential burglary; this time, he burglarized a home in Lindenhurst. (PSR ¶ 55.) Officers with the Suffolk County Police Department ("SCPD") arrested the defendant while he attempted to flee the location. (Id.) He was in possession of some of the property stolen from that residence. (Id.) The defendant pleaded guilty to this crime. (Id.)

3

In addition to running the investigative searches discussed above, the defendant ran other names through Lexis/ Nexis, Accurint and NCIC as set forth in the PSR. (See PSR ¶ 23.)

In addition to committing the aforementioned crimes, the defendant gave a robbery tip to two men, one of whom was a member of the burglary crew.  In October 2007, he told them that he had recently executed a search warrant of a home at 52-26 72nd Place in Maspeth, New York and recovered $145,000 (the "Maspeth Robbery").  The residents were believed to be trafficking in untaxed cigarettes.  The defendant told his coconspirators that they should rob that location because the residents were likely to have a large amount of cash.  The plan was for the defendant's coconspirators to impersonate law enforcement. While the defendant was not going to be present for the robbery, he was going to receive a share of the robbery proceeds.  The defendant's coconspirators conducted the robbery on October 12, 2007.  Armed with a fake badge, a fictitious search warrant and wearing jackets giving the appearance that they were law enforcement officers, the defendant's coconspirators approached the house and stated that they were police officers looking to execute a search warrant.  Once inside the home, they bound the male occupant with zip ties. They did not bind the female victim.  While they searched for cash, the female victim began screaming.  To avoid capture, the defendant's coconspirators fled before they could steal anything.

II.      PSR and Defendant's Objections to the PSR

The United States Probation Department ("Probation") prepared and submitted the PSR on June 1, 2015.  Probation concluded that the defendant's advisory Guidelines offense level was 27 and he was a criminal history category I, resulting in a range of imprisonment of 70 to 87 months.  (PSR ¶¶ 6-56, 80.)  This offense level was calculated using a base offense level of six (U.S.S.G. § 2B1.1(a)(2)), adding eighteen levels because the defendant and his coconspirators caused approximately $5.3 million in losses (U.S.S.G. § 2B1.1(b)(1)(J)), adding two levels because the defendant victimized ten or more people (U.S.S.G. § 2B1.1(b)(2)(A)), adding two levels because the defendant and his crew employed sophisticated means (U.S.S.G. § 2B1.1(b)(10)), adding two levels because the defendant abused his position of trust as an NYPD detective (U.S.S.G. § 3B1.3), and subtracting three levels for timely acceptance of responsibility.  (Id. ¶ 12.)  The government and the defendant agree that Probation correctly calculated the Guidelines.  (See Def. Mem. at 2.)

Despite that the defendant stipulated to the above-Guidelines calculation in his plea agreement and wrote that Probation "accurately calculate[d]" the Guidelines, the defendant seemingly objects to the abuse of trust enhancement and asks the Court to "exercise its discretion to adjust the Guidelines calculation."  (Def. Mem. at 3.)  In support of that argument, the defendant contends that an interaction that he had with a fellow law

4

enforcement officer while the defendant was participating in the burglary of a home in Howard Beach should not form the basis for the enhancement.  (Id.)  The government disagrees.  As set forth above, while the defendant's coconspirator was attempting to enter the home to commit the burglary, the defendant and one of his coconspirators sat in a parked car down the street looking for law enforcement officers.  (PSR ¶ 18.)  An NYPD officer approached the defendant and asked what he was doing.  (Id.)  The defendant displayed his police badge and falsely told the NYPD officer that he was there to pick up his niece—that was plainly a lie as the defendant was there because he was providing lookout coverage for his coconspirator.  (Id.)  The defendant used his position as an NYPD detective to avoid additional questions about his reason for being in the area, not because that was what the NYPD Patrol Guide required.  Accordingly, the role enhancement is appropriate. Alternatively, the Court should apply the enhancement because, as the defendant concedes, he accessed several databases that he had access to as a result of his position with the NYPD, including Lexis/Nexis, Accurint and NCIC, in furtherance of the instant offense.  (PSR ¶ 25.) Indeed, the defendant entered potential burglary targets' names into some of those databases using his partner's log-in information to find those targets' home addresses.  (Id.)

As part of the plea negotiation process, the defendant agreed that he participated in all of the burglaries attached to the plea agreement and that he would be held accountable for participating in those crimes.  He further stipulated to the Guidelines calculation, which held him accountable for all of those crimes.  He now invites the Court to find that those crimes are not relevant conduct and should not be considered, see Def. Mem. at 16-17, a position that is contrary to the plea agreement.  The Court should reject that invitation and hold him accountable for all of the burglaries that he admitted during his plea allocution.

The defendant argues that he was not present for a burglary of 5 Elizabeth Drive in Laurel Hollow.  (Def. Mem. at 2.)  The government agrees.  The defendant did not participate in that burglary.

The defendant further asserts that he did not participate in the burglary of 3273 Wolfson Drive in Baldwin other than running a database search.  (Def. Mem. at 2.)  The government disagrees.  The government's investigation revealed that the defendant was present for, and participated in, that burglary.

Finally, the defendant denies that he participated in the burglary of 152 Yukon Drive in Woodbury.  (Def. Mem. at 2.)  The government agrees that the defendant was not present for that burglary; the defendant did, however, assist in that burglary.  Specifically, after the defendant and his coconspirators burglarized Dr. Steven Greenberg's office and stole almost $2 million, the burglary crew decided to burglarize the doctor's home. However, they did not know his address.  So, the defendant ran an investigative search,

5

located the doctor's home address, provided the address to his coconspirators, and they committed the burglary without the defendant.

III.    The Defendant Should Be Sentenced to 87 Months' Imprisonment

For the reasons set forth below, the government respectfully submits that the defendant should be sentenced at the high-end of the advisory Guidelines range of 70 to 87 months' incarceration.

A.    Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a).  Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]"  Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S. 38, 46-49 (2007)).  However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence.  Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a).  Id.  That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and

(2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

B.    Analysis

Here, pursuant to the recent decisions of the Supreme Court, the Court's "starting point and the initial benchmark" should be the advisory Guidelines range of 70 to

87 months.  <u>Kimbrough</u> at 108 (citing <u>Gall</u> at 50 and <u>Rita v. United States</u>, 168 L. Ed. 203, 213 (2007)).

With respect to factor §§ 3553(a)(1) and (a)(2)(A), the instant offenses and the relevant conduct are serious offenses and need to be adjudicated in a manner that will promote respect for the law and provide just punishment for the offenses, which weighs heavily in favor of a 87-month sentence.  As set forth above, the defendant and his coconspirators burglarized Eye King stealing thousands of pairs of high-end sunglasses.  The defendant's coconspirators entered the business, cut the telephone lines, disabled the alarm and exited the location.  They waited to ensure that law enforcement did not respond to that location.  They then reentered the business and proceeded to steal more $1.7 million worth of sunglasses.  The defendant remained outside the location acting as a lookout.  After the burglary, the crew attempted to sell all the sunglasses, but they were unhappy with the price that they were being offered.  As a result, each participant was given their share of the sunglasses.  These offenses are more serious because they were committed by a sophisticated, organized group that terrorized Long Islander business owners and residents for years.

The number of burglaries that the defendant committed and the damage that those burglaries caused also supports an 87-month sentence.  In addition to the offense of conviction, the defendant admitted to burglarizing five other business and five homes.  In total, the defendant participated in eleven burglaries causing more than $5.3 million in loss.

Additionally, the length of the defendant's criminal conduct warrants an 87-month sentence.  The defendant argues that he should receive a two-year sentence because the instant offense was "an instance of . . . extraordinarily bad judgment."  (Def. Mem. 17.)  This was not "an instance" of poor judgment.  This was five years of bad judgment.  This was a conscious decision by the defendant to lead a life of crime.  Over the course of five years, the defendant used his position with the NYPD to identify possible victims, including a robbery target and burglary targets.  This was not a one-time event.  And the defendant was not threatened or coerced into participating in these crimes.  He chose to lead this life: a life where he used his badge to break, not uphold the law; a life where he entered people's homes and stole their hard-earned money and prized possessions; a life where he stole from hard-working Long Island business owners.

The defendant's history and characteristics also warrant a sentence within his advisory Guidelines range.  Despite that the defendant only has a limited criminal history, he is a long-standing member of the burglary crew.  He first joined the crew in January 2010 and continued committing crimes with them until he was arrested in June 2012.  Significantly, the defendant, unlike so many defendants that appear for sentencing, was raised by two loving parents in a home devoid of physical or verbal abuse.  The defendant did not suffer from any substance abuse issues.  He had every opportunity to lead a

productive, law abiding life: he had a positive upbringing, a supportive, loving family and had an excellent job working for the NYPD--a job that he calls his dream job--making a six figure salary. Despite all of this, he chose to commit serious crimes. He chose to victimize those who he took an oath to protect and serve. And he should be punished accordingly.

With regard to factor § 3553(a)(2)(B), affording adequate deterrence to criminal conduct, the defendant's crew committed more than forty burglaries stealing millions of dollars and products; the defendant participated in eleven of those burglaries. An 87-month sentence would send a strong message that conduct such as that engaged in by the defendant and his crew will not be tolerated.

In sum, the "nature and circumstances of the offenses," the "history and characteristics" of the defendant, the need to afford adequate deterrence and the need to provide just punishment all strongly warrant a sentence of 87 months.

In support of his request for a two-year sentence, the defendant argues that he "played a minor role for a limited period of time." (Def. Mem. at 15.) That argument is belied by the record. As set forth above, the defendant participated in eleven burglaries, including five residential burglaries. Not only did the defendant serve as a lookout, he actually entered several of the burglary locations. Moreover, the defendant's role as a police officer was important because through his position as an NYPD detective, he was able to identify home addresses for several of the burglary targets. Furthermore, the defendant's participation in this criminal activity spanned five years. Indeed, the defendant provided the robbery tip to his coconspirators in October 2007 and then he participated in the burglaries from January 2010 through June 2012.

The defendant's argument for a reduced sentence based on his attempted cooperation with the government is similarly without merit. (Def. Mem. at 15.) The defendant states that he was not offered a cooperation agreement "not for lack of effort on his part," but rather "because of [his] minor role in the overall conspiracy, he had nothing new to offer." (Id.) That is not accurate. The defendant was not offered a cooperation agreement because he never satisfied the most basic and threshold component of cooperation: telling the truth. In addition to his lack of candor, the defendant did not provide the government with information that would constitute substantial assistance. Thus, notwithstanding the fact that the defendant attended several proffer sessions with the government, he did not earn a cooperation agreement. However, the defendant now seeks the benefits of cooperation—in particular, a below-Guidelines sentence—even though he minimized his involvement in the crimes and did not tell the complete truth.

For example, the defendant repeatedly lied to the government about his involvement in the Maspeth Robbery. Indeed, when he was arrested in June 2012 by the SCPD, the defendant was questioned about that robbery. During that interview, the defendant told the FBI that he participated in the search of the Maspeth location but did not

8

knowingly give the robbery participants the information so that they could conduct a robbery. Rather, the defendant claimed that he was simply talking about his day and told them that he had executed a search warrant and recovered a significant sum of money. The defendant again told that version during the first proffer. The government informed the defendant that this version was inconsistent with its investigation. Indeed, two different cooperating witnesses informed the government that the defendant knowingly gave them this tip so that they could carry out the robbery. The government also told the defendant that his version did not make sense because there was no way for the robbery participants to know the address of the robbery target--according to the defendant's first version, he did not share the address when he recounted his day. At the next proffer, the defendant provided a second version attempting to explain how his coconspirators could have learned the robbery victims' address. He stated, for the first time, that he showed one of his coconspirators the NYPD operation plan for the search warrant and speculated that the coconspirator must have been able to see the address on the operation plan, which the defendant held in his hand, and then remembered the exact address (i.e., 52-26 72nd Place, Maspeth, New York). This was illogical and inconsistent with the government's investigation.

In addition to lying about his participation in the Maspeth Robbery, the defendant also failed to disclose several burglaries in which he participated. Specifically, the defendant did not admit that he participated in any of the residential burglaries. He did not disclose that he burglarized 157 Pace Drive (the home of the owner of Momma's Pizza) and claimed that he did not recall running database searches to identify the home address of Dr. Greenberg. He also falsely told the government that he did not know that his coconspirators were going to carry out the Howard Beach burglary. He stated that he thought they were only doing surveillance of that location on that day. As set forth above and in the PSR, that was untrue. (See PSR ¶ 18.) They had already conducted the surveillance, stole a truck and were there to complete the burglary. (Id.) The defendant also failed to disclose that he participated in the burglary of Rollin Dairy. It is undisputed that the defendant participated in that burglary and the aforementioned burglaries. The defendant's lack of candor and incomplete information rendered him unusable as a cooperating defendant and was one of the reasons why the government did not offer him a cooperation agreement.

In addition to the defendant's lack of candor on some issues, which compromised the utility of all information he provided, the information that the defendant did provide was either already known to the government or was incomplete. Further, the defendant's information did not contribute to the arrest or conviction of anyone, the defendant did not make any consensual recordings, and he did not testify at trial. Thus, the defendant did not provide the government with substantial assistance and was not offered a cooperation agreement for that reason as well.

While, of course, the Court may consider the fact that the defendant met with the government on a number of occasions, along with the other § 3553(a) factors discussed

9

above, the government respectfully submits that the defendant should not receive the benefits of cooperation or a reduced sentence without fulfilling the essential prerequisites: telling the truth and providing substantial assistance to the government.

IV.    Conclusion

The defendant was an integral part of a sophisticated burglary crew that victimized Long Island businesses and residents for more than three years stealing more than $5 million.  People's homes are their sanctuaries; the defendant used his position with the NYPD to invade those refuges to feed his own greed.   For the foregoing reasons, the government respectfully submits that a sentence of 87 months is appropriate in this case.


Respectfully submitted,

ROBERT L. CAPERS
United States Attorney


By:    _____/s/_____
       Christopher Caffarone
       Assistant U.S. Attorney
       (631) 715-7868


cc:    Peter Brill, Esq. (By email and ECF)
       U.S. Probation Officer Lisa Langone (by email)